Skoogfors v. Haverstick-Borthwick Co.

2

C.P. of Montgomery County, nos. 93-23217, 93-23226, 93-25271, 93-23272, 93-21683 and 94-17018.

*Steven E. Angstreich,* for plaintiffs Spungen.
*Arthur Hankin,* for plaintiffs Skoogfors.
*Michael O'Hayer,* for defendant Haverstick-Borthwick.
*John Patrick Kelley,* for defendant Facilities Resource Management.
*Ronald E. Hurst,* for defendant Bryn Mawr.
*Steven G. Bardsley,* for defendant With & Mactavish.
*Tracey M. McDevitt,* for defendant Dugan Inc.
*Joseph F. Van Horn Jr.,* for dedenfant Frei and Sons.
*Joseph P. Connor III,* for defendant McLeod Floors.

SALUS II, *J.*, January 13, 2000—

## SUMMARY

This is a motion in limine filed by the defendants to preclude evidence concerning medical diagnoses rendered by the plaintiffs' expert, Michael LeWitt M.D. In these suits, the plaintiffs allege that they sustained a number of health problems as a result of their exposure to chemicals used during renovation work at Bryn Mawr College.[1] The renovation work took place in the Great Hall in Thomas Library, commencing in December 1991 and concluding in May 1992. Following the alleged exposure, the plaintiffs sought medical attention from Dr. LeWitt, who diagnosed each plaintiff as having toxic chemical encephalopathy. Generally speaking, TCE refers to a pathologic or abnormal condition in the central nervous system that is associated with exposure to chemicals at toxic levels. In the defendants' motion in limine, the defendants argue that Dr. LeWitt's diagnoses and his methodology used in rendering his diagnoses are not

---

1. Although the plaintiffs' complaints vary, they generally claim to be hypersensitive to normal everyday levels of airborne substances, including vehicle exhaust, perfumes, aftershaves, paints, cleaning agents and scented products such as soaps, lotions, shampoos and cat litter. See *e.g.,* deposition of Anne Skoogfors, 7/30/96, at 86-87, 99-100. This sensitivity allegedly causes various reactions, including heart palpitations, sore throats and fogginess. See *e.g.,* deposition of Anne Skoogfors, 7/30/96, at 86, 102. In addition, the plaintiffs complain of chronic symptoms and suffering that includes headaches, blurred vision, shortness of breath, fatigue, memory loss, depression, lack of coordination, dizziness, mental anxiety, anguish, annoyance, inconvenience, humiliation, embarrassment, incapacity to perform usual daily activities, loss of life's pleasures, and inability to live life as it was before the alleged injury. See *e.g.,* complaint of Leif and Anne Skoogfors, filed 1/20/93, at 6.

generally accepted in the medical community.[2] As such, the defendants argue that Dr. LeWitt should be precluded from testifying, and any causation evidence that is derived from Dr. LeWitt's diagnoses should be barred. A hearing on the motion in limine was held before this court, commencing on December 6, 1999 and concluding on December 13, 1999. Based on evidence and testimony introduced at the hearing, this court concludes that Dr. LeWitt's diagnoses of TCE, and any testimony or evidence based on these diagnoses, are not admissible at trial.

## PENNSYLVANIA LAW ON SCIENTIFIC EXPERT TESTIMONY

At the outset, it is important to clarify the defendants' objections to Dr. LeWitt's diagnoses of TCE, and the role of the trial court in addressing these objections. As the plaintiffs point out, most of the defendants' objections go to the credibility of Dr. LeWitt and the weight to be given to his testimony. Ordinarily, questions of credibility of a witness and the weight of his testimony are for the jury to resolve. See *Foflygen v. Allegheny General Hospital,* 723 A.2d 705, 711 (Pa. Super. 1999). Where evidence involves complex scientific testimony, however, most laypersons lack the required training to assess the validity of the testimony and underlying methodology. In addition, a scientific expert's credentials can overcome a layperson's willingness to scrutinize the expert's testimony. Therefore, the Superior Court has held that scientific methodology and conclusions must be evaluated by the court to ensure that "what might appear . . . to be science is not in fact speculation in disguise."

---

2. Defendants' motion in limine at 4.

*Blum v. Merrell Dow Pharmaceuticals Inc.,* 705 A.2d 1314, 1325 (Pa. Super. 1997), *appeal granted,* ___ Pa. ___,[*] 735 A.2d 1267 (1999). According to the Superior Court:

"The judge in considering admissibility does not decide whether the proposition or theories are true or false. Rather the judge as gatekeeper decides whether the expert is offering sufficiently reliable, solid, trustworthy science. The question is: is the science good enough to serve as the basis for the jury's findings of fact, or is it dressed up to look good enough, but basically so untrustworthy that no finding of fact can properly be based upon it." *Blum,* 705 A.2d at 1322.

In the instant case, the condition known as TCE, and the methodology involved in making its diagnosis, are subject to debate by allergists, immunologists, toxicologists, neurologists, psychiatrists and occupational physicians. First, many medical professionals disagree as to whether the basis of TCE is immunological, neurological or psychological. Second, medical experts disagree on whether TCE is synonymous with or distinct from other medical conditions and phenomena. Third, medical professionals disagree as to which professionals are qualified to make a diagnosis of TCE. Fourth, medical experts disagree as to the proper method for rendering a diagnosis of TCE. Based on the foregoing, this court cannot agree with the plaintiffs that the credibility and weight of Dr. LeWitt's diagnoses of TCE should be within the sole province of the jury. Testimony by a qualified expert does not become admissible scientific evidence simply because it is uttered by that expert. See *Blum,* 705 A.2d at 1323. Since the evidence at issue is complex medical testimony, the admissibility of Dr. LeWitt's testimony is governed by principles established in *Blum.*

As a result, it is appropriate and necessary for this court to review causation evidence from Dr. LeWitt before it is put in front of the jury.

## REVIEW OF DR. LeWITT'S DIAGNOSES

In *Blum,* the Superior Court established a two prong analysis for determining whether scientific evidence of causation is admissible under Pennsylvania law. First, the proponent must show that the causal relationship is generally accepted in the medical community. *Blum,* 705 A.2d at 1322; see also, *Checchio v. Frankford Hospital-Torresdale Division,* 717 A.2d 1058, 1060 (Pa. Super. 1998). Second, the proponent must show that the methodology used to reach the expert's conclusions is accepted by the medical community as good science. *Blum,* 705 A.2d at 1322; see also, *Checchio v. Frankford Hospital-Torresdale Division,* 717 A.2d 1058, 1060 (Pa. Super. 1998). Following this analysis, this court has concluded that neither criteria is met in this case. Therefore, this court concludes that Dr. LeWitt's diagnoses of TCE, and any evidence based on or related to his diagnoses, are inadmissible.

a. *Causal Relationship Between the Plaintiffs' Alleged Exposure and Their Symptoms*

The plaintiffs have provided no evidence that the medical community currently accepts the existence of a causal relationship between their symptoms and the type of chemical exposure alleged to have taken place at Bryn Mawr College. First, there is no consensus in the medical community, as to whether TCE is even a disease, or a disease related to chemical exposure.[3] Second, even if

_____

3. In his discussion of TCE, Dr. Herman Staudenmayer, a psychologist, states in his report:

"We don't know what to call it.

TCE is generally accepted as a disease related to chemical exposure, existing research on TCE does not support a causal relationship in this case. This court understands that some studies link chemical exposure to a condition known as TCE. Nevertheless, the implications of these studies are limited in scope—they do not imply that TCE may be caused by exposure to every known chemical or combination of chemicals. In this case, there is no literature before this court that shows a generally accepted causal relationship linking exposure to the combination of chemicals used at Bryn Mawr College with the plain-

---

"It can't be defined.

"It can't be diagnosed.

"Responsible scientific disciplines tells [sic] us it does not qualify as a disease or as a syndrome.

"It has no consistently identified biologic mechanism of action.

"It is based on toxicological and physiological rationale that is implausible.

"It is inconsistent with the laws of chemistry and physics.

"For these reasons, it is best to think of 'environmental illness,' 'multiple chemical sensitivity' or 'toxic chemical encephalopathy' as a *phenomenon* rather than a disease." Report of Herman Staudenmayer Ph.D. 8/31/98, at 5.

In addition, Dr. Abba I. Terr, an allergist and immunologist, states in his report:

"The term 'toxic chemical encephalopathy' used in this case is a synonym for 'multiple chemical sensitivities. . . .'"

"The MCS phenomenon has been extensively studied and critiqued by a number of clinical and scientific investigators in recent years. These investigations show that patients diagnosed with MCS do not suffer an organic illness, but in many, if not most, cases, the symptomatology is consistent with underlying psychiatric disease unrelated to chemical exposure. Several national medical specialty societies have published reviews and position statements to the effect that MCS is not a recognized disease and that the methods used in diagnosis are unscientific." Report of Abba Terr M.D. 8/24/98, discussion paragraphs 7-8. (references omitted)

tiffs' symptoms.[4] This is the relationship that needs to be established. It is not enough that the plaintiffs cite studies linking adverse health effects with human exposure to chemicals, without any attempt to contrast the conditions in those studies with the facts in the instant case. As a result, this court cannot admit Dr. LeWitt's testimony or any evidence based on such testimony.

### b. *Methodology Used in Making Diagnoses of TEC*

After a review of expert reports and expert testimony from both sides, this court concludes that the methodology used by Dr. LeWitt in rendering his diagnoses of TCE is not accepted by the medical community as good science. According to the reports and testimony introduced at the hearing, the proper diagnosis of TCE entails the review of: (1) objective evidence of toxic exposure,[5] (2) objective physiological evidence of a disability or disease,[6]

---

4. Dr. Jack W. Snyder states in his report:

"Current biomedical literature does not offer a plausible, testable biologic theory, hypothesis, or mechanistic explanation by which inhalation of agents *such as those found in Great Hall during the 1992 renovation* could initiate cell processes that, in turn, could produce the plaintiffs' persistent complaints or NPT results." Report of Jack W. Snyder M.D., J.D., Ph.D. 7/28/98, paragraph (4)(a)(i). (emphasis added)

In addition, Dr. Staudenmayer testified he was not aware of any studies documenting adverse chronic neurologic symptoms from a chemical exposure history as short as five and one half months..N.T. 12/9/99, at 39. The plaintiffs have failed to provide any literature to rebut these assertions.

5. Objective evidence of exposure includes evidence of inhalation, absorption or ingestion of the chemical in measurable quantities, as well as data regarding the dosage and duration of exposure. See report of Jack W. Snyder M.D., J.D., Ph.D. 7/28/98, paragraph 5; affidavit of Abba I. Terr M.D. 8/27/98, at 4.

6. Objective physiological evidence that supports a diagnosis of TCE includes evidence of ataxia, tremors, abnormalities of the elec-

and (3) a differential diagnosis to eliminate possible alternative causes of the symptoms.[7] According to his own testimony, Dr. LeWitt rendered his diagnoses of TCE without any of the above elements. First, Dr. LeWitt did not have information on chemical dosage, which would enable him to determine whether the plaintiffs were exposed to chemicals at toxic levels.[8] Second, Dr. LeWitt observed no physiological evidence of a disability or disease.[9] Third, Dr. LeWitt did not complete a differential diagnosis that ruled out alternative causes of the plaintiffs' symptoms.[10] Dr. LeWitt's failure to complete a differential diagnosis is of particular concern, since many

troencephalogram (EEG), hallucinations, involuntary eye movements, cerebral atrophy, impaired hearing, impaired speech, impaired vision, and structural abnormalities revealed by MRI scans. See report of Jack W. Snyder M.D., J.D., Ph.D. 7/28/98, paragraph 3(b).

7. Differential testing or diagnoses are procedures routinely used to rule out other physical or psychological causes of a patient's symptoms. See report of Abba Terr M.D. 8/24/98, discussion paragraph 2; report of Herman Staudenmayer Ph.D. 8/31/98, at 6.

8. N.T. 12/8/99, at 35, 42. At the hearing, Dr. Terr testified, "neither I nor Dr. LeWitt nor anybody in the world as far as I know, actually knows what levels of chemicals were present there and whether these chemicals were present at a dose that would be capable of causing brain damage . . . ." N.T. 12/7/99, at 54. Since this information is lacking, Dr. Terr concluded that Dr. LeWitt's diagnoses of TCE were unreliable. N.T. 12/7/99, at 53-54.

9. According to Dr. LeWitt, when he sent the plaintiffs to a neurologist for neurologic testing, the neurologist found no objective findings of neurologic injury in any of the plaintiffs. N.T. 12/8/99, at 60. Dr. LeWitt also ordered a physical examination for at least one patient, and the patient tested normally for vision, hearing and pulmonary function. N.T. 12/8/99, at 30-31. Despite these test results, Dr. LeWitt diagnosed the patient as having TCE. N.T. 12/8/99, at 32.

10. N.T. 12/8/99, at 66. For example, Dr. LeWitt testified that he did not rule out the possibility that the plaintiffs' symptoms were caused by endogenous depression. N.T. 12/8/99, at 66.

facts were available to him that suggest alternative causes for the plaintiffs' symptoms.[11]

Dr. LeWitt's diagnoses of TCE were based on two criteria: (1) "temporality," which is the relationship between the time of the alleged exposure and the time when the symptoms occurred; and (2) "biological plausibility," which is a reasonable theory or hypothesis that an expo-

---

11. This court is troubled by a number of facts that suggest alternative causes of the plaintiffs' symptoms. One plaintiff, Anne Skoogfors, had pre-existing psychiatric problems that were ongoing during Dr. LeWitt's examination of her. N.T. 12/8/99, at 40. Based on a psychiatric consult ordered by Dr. LeWitt, Ms. Skoogfors was diagnosed with anxiety and depression N.T. 12/8/99, at 40. Dr. LeWitt did not testify with any certainty that he considered this when diagnosing Ms. Skoogfors with TCE. N.T. 12/8/99, at 40. Nevertheless, he testified that depression prompts patients to complain about problems with memory, concentration and ability to focus. N.T. 12/8/99, at 41. Another plaintiff, Allyn Bensing, was experiencing a marital breakup that started at or around the time of her alleged exposure. N.T. 12/10/99, at 19, 55. Prior to this breakup, Ms. Bensing had gone through two divorces, the second of which coincided with the death of her newborn child. N.T. 12/10/99, at 55-56. Dr. Frattaroli testified trial these experiences can be very serious psychological stressors. N.T. 12/10/99, at 56. Another plaintiff, Charlotte Love, was not employed or regularly present at Thomas Hall until after the renovation work was completed. N.T. 12/8/99, at 49-50. Renovation work was completed in May 1992. Ms. Love, however, did not start working at Thomas Hall until September 1992. N.T. 12/8/99, at 50. Since there is no evidence that solvents were used during Ms. Love's employment at Thomas Hall, there are questions as to whether her symptoms are associated with chemical exposure. Lastly, there is evidence that some or all of the plaintiffs consulted each other and discussed their symptoms, raising the possibility that the symptoms stemmed from hysterical contagion or other psychological phenomena. N.T. 12/9/99, at 74. These facts suggest that the plaintiffs' symptoms could be the result of psychological and/or psychiatric problems. Therefore, this court is not persuaded that psychological and psychiatric factors were sufficiently ruled out.

sure to something might cause a particular effect.[12] In addition, Dr. LeWitt testified that he used results from neuropsychological testing (NPT) to make his diagnoses of encephalopathy.[13] This court is persuaded by the defendants' experts that Dr. LeWitt's methodology is not generally accepted as good science. According to Dr. Snyder, temporality and biological plausibility, without more, cannot serve as the basis for concluding causation.[14] In addition, Dr. LeWitt has not properly established biological plausilbility.[15] As stated earlier, Dr. LeWitt had no objective evidence of a toxic exposure and no objective physiological evidence of a neurologic disorder. Therefore, the only way Dr. LeWitt could hypothesize any causal relationship would be through complete speculation. Lastly, NPT is not generally accepted in the scientific community as a reliable method for diagnosing an encephalopathy when there is no other objective evidence

---

12. N.T. 12/8/99, at 61-62.

13. N.T. 12/8/99, at 72. According to Dr. LeWitt, he used the NPT results to make his diagnosis of an encephalopathy. N.T. 12/8/99, at 72. He further concluded that this encephalopathy was related to toxic exposure to chemicals based on the plaintiffs' experiences at Thomas Hall. N.T. 12/8/99, at 72.

14. N.T. 12/6/99, at 32. According to Dr. Snyder, temporality and biological plausibility only make up part of a causation analysis. N.T. 12/6/99, at 14. There are a number of criteria that must be evaluated in order to establish causation in a particular case, including a dose-response relationship, evidence from animal studies and persistency of symptoms when the causal agents are removed. N.T. 12/6/99, at 18-23.

15. N.T. 12/6/99, at 35. According to Dr. Snyder, Dr. LeWitt has not offered any testable theory by which he could explain how the plaintiffs sustained injury to their central nervous systems. N.T. 12/6/99, at 35.

of an encephalopathy.[16] As a result, Dr. LeWitt's diagnoses of TCE were based on a methodology that is not generally accepted by the scientific community as good science.

## CONCLUSION

The trial judge must be careful not to trespass over the domain which our judicial system reserves exclusively for the fact-finder. Nevertheless, the trial judge must balance this caution with his or her duties as the gatekeeper of evidence. When the court is confronted with scientific or medical evidence, that evidence may stand firmly on good science, or it may be strung together by controversial principles and sketchy methodology. This court concludes that Dr. LeWitt's diagnoses of TCE fall into the latter category. The condition known as TCE is subject to debate by medical experts who question whether it is even a bona fide disease. They debate whether the basis of TCE is neurological or psychological. Furthermore, the causal relationship specifically alleged in this case has not been supported by medical literature or any objective evidence of toxic exposure or neurologic dam-

---

16. N.T. 12/6/99, at 52-54. The record indicates that the use of NPT results in diagnosing TCE is untrustworthy for a number of reasons. First, NPT procedure is not standardized and varies in every study, making it difficult to review literature in which NPT is used in cases of TCE. N.T. 12/6/99, at 53. In addition, NPT procedure and results are capable of being manipulated by both the test subject and the test administrator, as Dr. Lewitt himself indicated. N.T. 12/8/99, at 70. Lastly and most importantly, NPT results can be impacted by the presence of conditions unrelated to neurologic function such as psychiatric problems like anxiety and depression. N.T. 12/8/99, at 70, N.T. 12/9/99, at 92, 103-104. For these reasons, NPT has been accepted only as a confirmatory test for TCE and only when other objective evidence of TCE has been presented to the diagnostician. N.T. 12/6/99, at 54.

age. This court cannot allow the jury's findings of fact to be supported by such evidence. Therefore, any evidence of Dr. LeWitt's diagnoses of TCE, and any causation evidence that is based on his diagnoses, must be precluded.

### ORDER

And now, January 13, 2000, based on the findings in this court's opinion sur motion in limine, it is hereby ordered and decreed that the defendants' motion in limine is granted. The plaintiffs and plaintiffs' witnesses are precluded from arguing, making reference to, or testifying about any diagnosis of toxic chemical encephalopathy, toxic exposure, multiple chemical sensitivity, or any causal relationship that attributes one or more of the plaintiffs' symptoms to chemical exposure.