## Erika WENTZ *v.* SERVICE MASTER

CA 01-132 57 S.W.3d 753

Court of Appeals of Arkansas
Division IV
Opinion delivered October 24, 2001
[Petition for rehearing denied November 28, 2001.]

*Walker, Shock & Cox, PLLC*, by: *Eddie H. Walker, Jr.*, for appellant.

*Rieves & Mayton*, by: *Eric Newkirk*, for appellee.

OLLY NEAL, Judge. This is a workers' compensation action. Appellant, Erika Wentz, appeals from the decision of the Workers' Compensation Commission (the Commission) denying her claim for additional benefits. The Commission adopted the administrative law judge's (ALJ) finding that appellant failed to prove she sustained a compensable physical injury to the brain because the medical evidence was not supported by objective findings. On appeal, appellant argues there was no substantial evidence

to support the Commission's decision that the medical opinion in this case was not based on objective findings, and there was no substantial evidence to support the Commission's determination that appellant failed to prove by a preponderance of the evidence that she is entitled to temporary total disability and medical benefits after June 9, 1999. We reverse and remand the decision of the Commission for further proceedings.

Appellant was employed by appellee, Service Master, as a service partner cleaning and servicing machines at Planter's Peanuts. On the evening of December 30, 1998, she was cleaning the floor, and when she came out from underneath a line, her feet came out from under her and she fell head first, hitting her head and the right side of her face on a concrete floor. Although appellant suffered a concussion as a result of the fall, she did not immediately seek medical attention.

On January 5, 1999, appellant was treated in the emergency room of Sparks Regional Medical Center by an internist, Dr. Lance Hamilton. After performing X-ray and MRI testing on appellant, he opined that appellant was suffering from symptoms secondary to the fall. Due to delirium, appellant was admitted to the hospital in February. At this time, she reported to Dr. Hamilton that since the fall, she had been suffering from severe headaches and changes in her mental status. Dr. Hamilton referred appellant to Dr. Douglas Brown, a neuropsychologist. After performing a neuropsychological evaluation on appellant, Dr. Brown diagnosed appellant as having an organic brain disorder, secondary to closed-head injury, mild. Appellant's workers' compensation case manager, Yolanda Kimbrough, asked Dr. Michael Morse to see appellant. Dr. Morse diagnosed appellant as having post-traumatic headaches, along with a post-traumatic encephalopathy and depression. Prior to appellant's visit with Dr. Morse, appellee acknowledged that the injuries to appellant's head and face were compensable and paid temporary total disability benefits and medical benefits through June 9, 1999. However, after Dr. Morse's diagnosis, appellee denied liability for additional benefits.

The ALJ found that the injury to appellant's right jaw and face were compensable injuries. However, the ALJ found that appellant failed to prove by the greater weight of the credible evidence that her jaw/head injuries caused her to be rendered temporarily totally disabled after June 9, 1999. The ALJ also found that appellant failed to prove she sustained a compensable physical injury to the brain as the result of her fall. The Commission affirmed and adopted the

decision of the ALJ. Appellant argues there was insufficient evidence to support the Commission's decision.

■ When reviewing a decision of the Workers' Compensation Commission, we view the evidence in the light most favorable to the Commission and affirm the decision if it is supported by substantial evidence. *Rice v. Georgia-Pacific Corp.*, 72 Ark. App. 149, 35 S.W.3d 328 (2000). Substantial evidence is that relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Wheeler Constr. Co. v. Armstrong*, 73 Ark. App. 146, 41 S.W.3d 822 (2001). A decision by the Workers' Compensation Commission should not be reversed unless it is clear that fair-minded persons could not have reached the same conclusions if presented with the same facts. *Rice, supra.*

■ The purpose of our workers' compensation law is to pay benefits to legitimately injured workers who suffer an injury arising out of and in the course of their employment. *Baker v. Frozen Food Express Transp.*, 63 Ark. App. 100, 974 S.W.2d 487 (1998); *see also* Ark. Code Ann. § 11-9-101(b) (Repl. 1996). The employee has the burden of proving a compensable injury. *Carman v. Haworth, Inc.*, 74 Ark. App. 55, 45 S.W.3d 408 (2001). "A compensable injury must be established by medical evidence supported by 'objective findings.' " Ark. Code Ann. § 11-9-102(4)(D) (Supp. 1999). " 'Objective findings' are those findings which cannot come under the voluntary control of the patient." Ark. Code Ann. § 11-9-102(16)(A)(i) (Supp. 1999). Appellant argues on appeal that there was no substantial evidence to support the Commission's decision that the medical opinion in this case was not based on objective findings. Specifically, appellant argues that neuropsychological testing is objective.

In his testimony, Dr. Morse stated that "[a] neuropsychological evaluation is objective testing for brain function." He explained that "neurological examination will show you if there is any big problem like paralysis or numbers or vision problems or coordination problems, and then the neuropsychological evaluation looks at the mental function of the brain; the ability to do calculations, memory, organize thought, learn, carry out activities."

Dr. Brown admitted that with neuropsychological testing, the patient controls her response. He explained that the "ultimate diagnosis is based upon [the] results of [the patient's] responses which are compared with results of thousands and thousands of others who have done the exact same tests for many years before." He also

explained that when assessing the test results "[he] specifically check[s] to see whether there [are] any indicators that would cause [him] to conclude that [the patient] was attempting to manipulate the test results."

 The evidence establishes that appellant had only a ninth-grade education. On March 18, 1999, she saw Dr. Brown for neuropsychological testing. The testing was not finished until March 24, 1999, because appellant suffered exhaustion after the first testing session. Dr. Brown testified that the fatigue factor determines whether psychological examinations are done on one day or two separate days. He explained that administering the examination on one day or two separated days does not affect the validity of the testing. Dr. Brown testified that different tests were administered on each occasion. Dr. Brown further testified that he did not believe that:

> Ms. Wentz's intellectual level or her memory capacity were high enough to manipulate the neuropsychological test. Also, given the broad spectrum of testing that we administer to people such as Ms. Wentz for neuropsychological evaluations, its [sic] virtually impossible to manipulate them to come out the way you want them to, because you don't know what each and every piece of the testing means.

We hold there was no evidence that suggested appellant manipulated the testing.

 The Pennsylvania courts have found that neurological testing is not generally accepted in the scientific community as a reliable method for diagnosing an encephalopathy when there is no other objective evidence of an encephalopathy. *Skoogfors v. Haverstick-Borthwick Co.*, 44 Pa. D. & C.4th 1 (2000). However, in the case at bar, there is other objective evidence that indicates appellant suffered an injury to her brain. It is uncontroverted that when appellant fell, she landed on the right side of her face on a concrete floor. Dr. Morse opined that appellant suffered nausea and vomiting, and that light made her symptoms worse. He also noted that she did not have any of these symptoms prior to the fall. Furthermore, Drs. Brown and Morse testified that appellant suffered a closed-head injury as a result of the fall. Dr. Brown stated in his report that appellant is suffering from behavioral and cognitive agitation. He also stated that cognitive agitation is often seen with injuries to the cortical processes. Dr. Brown testified that prior to the fall, he estimates that appellant's intellectual capacity was in the

range of ninety-five to one hundred, and now it is in the low eighties. In addition to Dr. Brown's testimony that appellant's memory is deficient, Dr. Hamilton stated that since the fall, appellant has suffered from memory problems, periodic headaches, anxiety, and emotional changes. In his final discharge diagnosis, Dr. Hamilton diagnosed appellant as suffering from a concussion. A concussion is defined as a jarring injury of the brain resulting in disturbance of cerebral function. *Webster's Ninth New Collegiate Dictionary* 273 (1990). Appellant describes herself as weighing 135 pounds and approximately 5'6" in height. She testified that:

> I was cleaning up the floor, standing in some water and chemicals, and my feet came out from underneath me at a side angle. I fell. My feet came up above me. I came down on the right side of my face and head and that's what hit first. My head and the right side of my face actually hit the floor first. It was a cement floor.

When a person of that size and stature falls head first onto a concrete floor, it is conceivable that her brain will suffer some jarring.

 Objective findings are also defined as medical opinions stated with a reasonable degree of medical certainty. *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001); *see also* Ark. Code Ann. § 11-9-102(16)(B) (Supp. 1999). Our supreme court has held that medical evidence supported by objective findings is not essential in every case, but if medical opinions are offered, they must do more than state that the causal relationship between work and the injury is merely a possibility. *Id.* Our supreme court has gone on to say that, if a doctor renders an opinion that goes beyond possibilities and establishes that a work-related accident was the reasonable cause of the injury, this will establish a reasonable degree of medical certainty. *Id.* Furthermore, if the claimant's disability arises soon after the accident and is logically attributable to it, with nothing to suggest any other explanation for the employee's condition, we may say without hesitation that there is no substantial evidence to sustain the Commission's refusal to make an award. *Min-Ark Pallet Co. v. Lindsey*, 58 Ark. App. 309, 950 S.W.2d 468 (1997) (quoting *Hall v. Pittman Constr. Co.*, 235 Ark. 104, 357 S.W.2d 263 (1962)).

Appellant testified that on November 13, 1998, she was kicked in the chin, and the blow caused her to hit her head on the edge of

a couch. Appellant testified that her mother took her to the emergency room because she experienced blurred vision and a concussion. She testified that, after this incident, everything was fine. Appellant also testified that after her fall on December 30, 1998, she began experiencing panic attacks and fainting spells, her writing skills changed, and she could no longer drive. Dr. Brown testified that he was unaware of the November 13 incident, but believes that because appellant received no further treatment after the November 13 incident, it was of no significance. He further testified that "in [his] opinion within a reasonable degree of medical certainty it is more likely than not that the December 1998 fall is the cause of [appellant's problems]." Dr. Morse also testified that he believed within a reasonable degree of medical certainty that the fall on December 30, 1998, was the cause of appellant's current problems.

The evidence clearly establishes that appellant began experiencing her current problems after her fall at work. The medical opinions are sufficiently certain and definite that her injuries are the result of her fall at work. Therefore, a causal relationship exists between the resulting injury and her work activity. Based on the evidence, we hold that fair-minded persons could not have reached the same conclusions as the Commission if presented with the same facts.

Appellant also asks us to hold that there was no substantial evidence to support the Commission's determination that she failed to prove by a preponderance of the evidence that she is entitled to temporary total disability and medical benefits after June 9, 1999. Temporary total disability is awarded when the claimant shows she is within her healing period and is totally incapacitated from earning wages. *Superior Indus. v. Thomaston*, 72 Ark. App. 7, 32 S.W.3d 52 (2000). The healing period is that period for healing of an injury which continues until the claimant is as far restored as the permanent character of the injury will permit. *Byars Constr. Co. v. Byars*, 72 Ark. App. 158, 34 S.W.3d 797 (2000). Whether a claimant's healing period has ended is a factual question that is resolved by the Commission. *Dallas County Hosp. v. Daniels*, 74 Ark. App. 177, 47 S.W.3d 283 (2001).

Dr. Morse testified that appellant suffered from posttraumatic encephalopathy and depression. He believed her posttraumatic encephalopathy and depression prevented her from returning to work. The other physicians did not address whether appellant was unable to work. Appellant testified that she has not worked since the accident. She testified that as a result of the fall,

she no longer drives for fear of blacking out and she suffers from dizziness. Based upon the evidence, there was no substantial evidence to support the Commission's determination that appellant failed to prove by a preponderance of the evidence that she was entitled to temporary total disability and medical benefits after June 9, 1999; therefore, we reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.

STROUD, C.J., agrees.

GRIFFEN, J., concurs.

WENDELL L. GRIFFEN, Judge, concurring. Although I join the decision to reverse and remand for an award of benefits, I write separately to explain why our past decisions concerning objective findings should be overruled. Prior to a hearing before the administrative law judge, appellee conceded that appellant sustained compensable injuries to the right side of her face or head as a result of the fall. However, appellee disputed whether the accident also resulted in an injury to appellant's brain. It also disputed whether appellant was entitled to the payment of medical expenses and temporary total disability benefits from June 10, 1999, through a date to be determined.[1] As proof of her claim that she sustained an injury to her brain, appellant presented the medical testimony and/or records of Dr. Michael Morse, a board certified neurologist; Dr. Douglas Brown, a certified neuropsychologist; Dr. Lance Hamilton, a general practitioner; Dr. Joe Dorzab, a psychiatrist; and Dr. Timothy Best, a board certified neurologist. All of the medical experts who evaluated appellant agreed that she suffered an injury to her brain as a result of her December 30, 1998, fall. There is no evidence to the contrary.

Dr. Morse testified that when he initially evaluated appellant, she was experiencing severe headaches, face pain, and emotional problems. After treating appellant for post-traumatic headaches and face pain, and diagnosing her with post-traumatic encephalopathy as a result of her December 30, 1998, fall, Dr. Morse referred her to a neuropsychologist for an evaluation. He testified that neuropsychological tests differ from neurological tests, in that neurological

---

[1] The parties stipulated that appellant sustained a compensable injury to her right jaw and/or face, and that all medical expenses and all temporary disability benefits had been paid through June 9, 1999.

tests measure the loss of motor function such as paralysis, numbness, vision, and coordination. On the other hand, neuropsychological tests assess a person's ability to calculate, remember, learn, organize thoughts, and carry out activities, which Dr. Morse opined served as a reliable assessment of the loss of brain function. Dr. Morse expressed his opinion that a neuropsychological evaluation is an objective testing of brain function because other tests, such as magnetic resonance imagery (MRI) or computerized tomography (CT) scans, are not equipped to detect small tears in the brain. He testified that even though appellant's CT scans and MRIs were normal, she might still have tears in her brain.

The record also includes a November 9, 1999, medical report from Dr. Lance Hamilton. Dr. Hamilton's assessment of appellant in February 1999 was that her change in mental status and symptomatology was secondary to a closed head injury that she suffered from a fall at work. The report indicated that Dr. Hamilton admitted appellant into the hospital in February 1999 for delirium after she experienced severe headaches and a change in mental status. It further relayed that appellant had an MRI of her brain, which was normal except for sinusitis; an X-ray of her facial bones that was normal; a repeat CT scan in February 1999 that was normal for the brain but continued to show sinusitis, and laboratory work that did not show any significant abnormalities. Appellant also underwent an EEG during her February hospital stay that did not demonstrate seizures. In addition, the report indicated that appellant was seen by representatives of the neuropsychology, neurology, and psychiatry departments, who concurred that appellant's mental changes were secondary to her concussion. Dr. Hamilton concluded his report by stating that he had appellant assessed by Dr. Doug Brown, who found that appellant had an organic brain disorder secondary to closed head injury and organic affective disorder of the depressed type that was moderate to severe.

Appellant also introduced a medical report from Dr. Joe Dorzab that was dictated on February 27, 1999. Dr. Dorzab described appellant's mental status exam as normal except for irritability, easy crying, and depression. He also stated that her memory was excellent, and that she was not suicidal or psychotic. Under a heading entitled "Psychiatric Impression," Dr. Dorzab indicated "deferred, suspect some combination of post-concussion syndrome, medication depression and situation factors."

In his deposition testimony, Dr. Brown, a neuropsychologist, testified that he performed a neuropsychological evaluation on

appellant on March 18, 1999, and March 24, 1999, after she was referred to him by Dr. Hamilton. Dr. Brown testified that he was aware that appellant underwent diagnostic examinations, including a CT scan and an EEG. However, Dr. Brown opined that the fact that the diagnostic examinations were normal, and did not indicate there was nothing wrong with appellant's brain. Dr. Brown testified that EEGs were used to determine whether a person had a seizure disorder, and that CT scans may or may not show damage to the brain in terms of structural changes. *He testified that changes that have to do with the function of the brain were only measurable by neuropsychological evaluations.* Dr. Brown opined that although the responses given by appellant were within her control, the results were not, because the tests were safeguarded to prevent patient manipulation. He testified that he based his diagnosis of appellant on the *results* of a series of tests that he administered and *not the responses of appellant.* These tests involved oral responses, written responses, and the performance of various directed physical activities. Dr. Brown testified that the results of the tests were assessed based on patterns established when considering the totality of appellant's responses. He opined that appellant did not have the intellectual level or memory capacity to manipulate the tests, and that unless appellant had extensive knowledge and expertise in the area of neuropsychology, she would not be able to voluntarily control or influence the patterns yielded by her multiple responses. Dr. Brown testified that it was his opinion within a reasonable degree of medical certainty that it was more likely than not that the December 1998 fall appellant sustained was the cause of her brain injury.

Specifically, Dr. Brown stated that he found appellant had a low average range of intelligence, with a very large and significant difference between verbal and nonverbal ability that occurred *only* in certain situations such as brain damage or learning disabilities. He also found a loss of intellectual capacity that looked to be in the fifteen to seventeen point range, and a memory loss in the same range. Dr. Brown stated that the neuropsychological test indicated a weakness of the right frontal cortex and general cortical processing as a whole, with a very severe depression with cognitive and behavioral agitation. He also stated that appellant fit a profile that had been established over the years as consistent with a closed-head injury.

The Commission affirmed and adopted the decision of its administrative law judge based on Arkansas Code Annotated section 11-9-102(5)(D) (Supp. 1999), which requires that a compensable injury be established by medical evidence supported by objective

findings as defined by section 11-9-102(16). Arkansas Code Annotated section 11-9-102(16)(A)(i) (Supp. 1999), defines "objective findings" as "those which cannot come under the voluntary control of the patient." Despite our previous decisions in *Swift-Eckrich, Inc. v. Brock*, 63 Ark. App. 118, 975 S.W.2d 857 (1998), and *Duke v. Regis Hairstylists*, 55 Ark. App. 327, 935 S.W.2d 600 (1996), I vote to reverse the Commission and remand this case for a determination of benefits.

It is settled law that the overriding purpose of our workers' compensation laws is to pay benefits to legitimately injured workers. *See* Ark. Code Ann. § 11-9-1001 (Repl. 1996). It is also clear that the provisions of our workers' compensation law enacted by Act 796 of 1993 are to be strictly construed by administrative law judges, the Commission, and the courts without giving the benefit of the doubt to either party. *See* Ark. Code Ann. §§ 11-9-704(c)(3) and (4) (Repl. 1996). We are governed by the substantial evidence standard of review that obligates us to affirm the Commission if its decision is supported by substantial evidence, *i.e.*, evidence upon which reasonable minds could have reached the same conclusion. None of these principles justifies affirming the Commission's decision. Instead, this case presents clear proof that the footnote I appended to our decision in *Swift-Eckrich, Inc. v. Brock, supra*, and our rationale in *Duke v. Regis Hairstylists, supra*, were fundamentally flawed.

In *Duke v. Regis Hairstylists, supra*, we affirmed the Commission's decision to deny workers' compensation benefits to a woman who alleged that she sustained carpal tunnel syndrome arising from her employment. The treating physician diagnosed the worker's condition based upon medical test findings which were based on the patient's responses to certain stimuli administered by the physician. It was undisputed that an informed patient could voluntarily control her responses to the stimuli administered by the testing physician. In view of the requirement of subsection 11-9-704(c)(3) that the provisions of the workers' compensation law be strictly and literally construed, a majority of our court affirmed the denial of benefits and concluded that the tests did not constitute objective findings.

In *Swift-Eckrich, Inc. v. Brock, supra*, we affirmed the Commission's decision awarding benefits to a worker injured after she was knocked unconscious when struck by a vehicle in her employer's parking lot. In that case, CT scans revealed cerebral edema and interhemispheric hemorrhage and neuropsychological test results

indicated that the worker sustained residual defects in her higher verbal memory, higher level balance, and loss of smell and taste secondary to cranial nerve damage. Although we observed that Brock's complaints of pain, headaches, and her verbal responses to neuropsychological tests were within her voluntary control so as to not constitute "objective findings," we held that substantial evidence existed to support the Commission's finding and award of compensation benefits based on the intercranial bleeding, cranial nerve damage with associated loss of smell and taste, and the results of her CT scan. In a footnote to our decision, I wrote:

> Although this court has previously found that objective findings included diagnoses developed by physicians "based on results obtained from clinical tests which reveal consistent and repeated responses to specific stimuli," [citing *Keller v. L.A. Darling Fixtures*, 40 Ark. App. 94, 845 S.W.2d 15 (1992)] *Keller*, 40 Ark. App. at 98, 845 S.W.2d at 17, such holdings are no longer valid in light of the strict interpretation of the statute which defines objective findings as those not under the voluntary control of the patient. *Duke v. Regis Hairstylists*, 55 Ark. App. 327, 935 S.W.2d 600 (1996). Objective findings did not exist in *Duke* where the findings were based upon patient responses to stimuli even where the tests had built in safeguards against patient fabrications.

*Id.* at 122, 975 S.W.2d at 860.

That statement and the decision in *Duke v. Regis Hairstylists, supra*, resulted from a fundamental mistake about the meaning of the word "findings." Arkansas Code Annotated section 11-9-102(16)(A)(i) states that objective findings are "those [meaning findings] which cannot come under the voluntary control of the patient." In our decision in *Duke v. Regis Hairstylists* and the footnote in *Swift-Eckrich v. Brock*, we construed "findings" to mean the responses that patients provide during clinical testing which can be voluntarily controlled. Thus, in *Duke*, we construed the worker's physical responses to certain tests done by the attending physician as "findings." The Commission followed our decisions in the present case resulting in the appellant's closed-head injury being held as non-compensable because (a) she underwent MRI and CT scanning that revealed no abnormalities to her brain and (b) the neuropsychological test results on which the medical personnel have based their diagnosis of her closed head injury are dependent on responses were theoretically within her control.

But a finding is a determination, not the data upon which that determination is based. "Finding" in the medical sense means a determination by a physician based upon certain data about a condition, disease, or injury. Section 11-9-102(16)(A)(i) provides that objective findings are *findings* that cannot come under the voluntary control of the patient. The relevant inquiry, therefore, is not whether the *clinical data*, or certain datum, are within the patient's control. Appellant's responses to neuropsychological testing are not findings, collectively or specifically. Instead, they are nothing other than indices from which the findings were made. The findings rendered by the physicians who examined appellant were no more within her voluntary control than a factual finding by a trier of fact is within the voluntary control of a witness who reports his or her recollections.

I am sure my analysis will be viewed by some as an attempt to circumvent Act 796 of 1993. I view Act 796 as a draconian legislative scheme; however, that perspective does not control my analysis. Rather, I reach this decision because Ark. Code Ann. §§ 11-9-704(c)(3) states: "Administrative law judges, the commission, and any reviewing courts shall construe the provisions of this chapter *strictly*." (Emphasis added.) Strict construction "obviously connotes a degree of stringency about finding implications and drawing inferences when working with statutes." *See* Morell E. Mullins, Sr., *Coming to Terms With Strict and Liberal Construction*, 64 ALBANY L. REV. 9, 29 (2000).

Test data and patient responses are not findings under any reasonably necessary implication or logical inference. Admitting the distinction between them is entirely consistent with strict construction. Pretending that they mean the same thing is not. Rather than pretend that we are distinguishing this case from our decisions in *Duke* and *Swift-Eckrich*, I would overrule those decisions outright. We can either acknowledge that our past reasoning was flawed, or we can act in slavish obedience to those decisions from an equally flawed notion of *stare decisis*. There is nothing noble or intellectually honest about slavish obedience to a rule whose error is obvious upon deeper reflection.

Moreover, the fields of science and medicine have long recognized a distinction between the responses made by patients and test subjects to stimuli and findings reached by scientists and physicians. When a patient who undergoes an eye examination looks at a visual field and declares whether he sees certain letters, numerals, and

objects, that response is plainly within the patient's voluntary control. But the response is not a medical finding about the patient's vision. When a patient who undergoes auditory examination listens to tones and responds to auditory stimuli (or fails to respond), those responses (or nonresponses) are not clinical findings. Likewise, when patients respond to physical stimuli during clinical testing, their responses are not findings. The findings are made by the professionals in ophthalmology, audiology, or whatever discipline is practiced by the professional in question. As jurists, we should acknowledge the clear difference between objective findings (those made by an examiner whose judgment is not distorted by the patient) and the data from which those findings are obtained. Patient responses are not, as our previous decisions would have one believe, controlling on medical or scientific objectivity. The opposite of objective medical findings are findings based on bias, prejudice, or speculation. That is a far different thing from patient responses.

Finally, this case and our decision in *Swift-Eckrich, supra,* demonstrate that neuropsychology addresses medical and scientific realities that cannot always be anatomically quantified. The uncontradicted expert testimony in this record is that appellant suffered a closed-head injury consistent with a physical injury to the right frontal area of her brain, accompanied by headache, facial pain, nausea, loss of coordination, personality changes, loss of concentration, and other cognitive changes. The opinion of the administrative law judge (which was adopted by the Commission) acknowledges that this evidence medically proves "the presence or existence of some degree of physical injury to the claimant's brain." However, the uncontradicted expert testimony in this record is that such injuries often go undetected even with magnetic resonance imagery or computerized axial tomography. In isolated cases, they have been detected following postmortem inspection of the brain.

Neuropsychology is not superstition, witchcraft, or junk science. Rather, it is a respected and established body of science that combines neurology, physiology, and psychology. There is no intelligent reason why courts and judges should disregard an entire body of scientific knowledge long acknowledged as legitimate merely because current medical technology does not enable radiologists to detect what neuropsychologists can confirm. The experience of Galileo dying under house arrest centuries ago should give us caution us about making sweeping legal conclusions based on the limitations of current and past technology.